IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

UNITED STATES OF AMERICA

vs.                                                                       CRIMINAL CASE # 05-00290-CB

AKIL FIGURES
_____/

**MOTION FOR EARLY TERMINATION OF
SUPERVISED RELEASE TERM**

COMES NOW **AKIL FIGURES** and hereby moves the court for early termination of his supervised release term (SRT) and in support thereof says as follows:

**I. Apart from Two Technical Infractions, Mr. Figures Record on SRT Is Unblemished.**

Akil Figures was released from custody on October 31, 2011, he has served more than fifty percent of an eight year supervised release term. During that time, he has been gainfully employed, he never tested positive for drug use, and has not been charged with any new crimes. In this respect he ranks among the few highly regarded as eligible for early termination of SRT. In the more than four years on SRT, Figures was cited for two technical infractions, one for traveling out of the district without prior authorization, and the other for sending a text message after being ordered to refrain from any further communication with a woman with whom he had a relationship. Mr. Figures' probation officer confirmed that these were the only infractions committed by Figures while on SRT. On balance, his record on SRT establishes a fairly successful record of compliance and positive adjustment.

In reviewing Mr. Figures' last request to end SRT counsel submits that he failed to fully describe his long road to redemption. It is my practice to interview clients with an eye to identify

1

key events in their lives which shape or influence their development.  I do this to learn their respective life stories, to get a glimpse of events which shape or influence them, and to get a sense of how they cope with negative or stressful life experiences.  At times, their words speak volumes.  Such is the case with Mr. Figures.  He described his upbringing and transformation in the following manner:

> I came up in a very humble, but strict household. One in which good enough wasn't accepted and negativity of any shape, fashion, or form wasn't tolerated. My brothers and I would get punished for the simplest of things, such as using the word "ain't." My parents ruled with an "iron fist" so to speak. My dad however was the main enforcer, whom we feared a lot more than my mother. Most of their firm disciplinary ways, were those in which the three of us (my brothers and I), never did understand until we were up in age. Now I look back and I am very appreciative for the parents/teachers/disciplinarians that God blessed me with. I observe a lot of parents nowadays raising their children and I can't do anything but shake my head. You see there is a big difference in knowing better and not knowing any better. Some kids end up victims of society and the judicial system, because they weren't taught any better from the very beginning. That wasn't my case at all. I couldn't even begin to try to fix my mouth to make up such an excuse because I've always known better.
>
> I do strongly believe though, that if my father hadn't passed when I was 14 things would have turned out a whole lot different for me. Yet and that is still no excuse. He taught me very well before he passed, furthermore, he left me with a great mother, an extraordinary family, and supporting cast.
>
> At the end of the day I was just very rebellious. I always had my own mind, so I'd be lying if I said I was ever trying to fit in, or was ever pressured by any of my peers. However I will say that just the fact of me hanging around the wrong crowd, slowly but surely, affected me, and led to my illegal acts.
>
> I was first placed on probation at eighteen, with the same rebellious mind set I had when I was thirteen. The only rules I was willing to abide by were my own. I couldn't be talked to at all. I was in and out of jail every three months for five years until I caught this Federal case .
>
> This last sentence (although I think was a little too long) is one I think I needed years ago. I really had time to sit back, think, and realize just how stupid and embarrassing I'd been living. I had time to evaluate, and then go back and reevaluate myself as a person and the  irresponsible way I'd been living. It was a substantial enough amount of time for me to grow older, and finally mature mind wise. It was during this time

> that I'd begin to come to the realization of what it was going to take to remain free for more than those three months to which I had become accustomed. Therefore, by the time I was released I had no fear of ever going back prison.
>
> Ms.Scott, one of my counselor in the five hundred hour drug program at Maxwell, always said: "You have to first line your ducks up - get your ducks in a row, as far as what you need to be doing, and know you what you must do order to refrain from a criminal mind set and lifestyle." I say this to say that upon my release, I knew I had my ducks in a row, as far as what it was going to take to live a constructive, productive, well rounded, and healthy lifestyle that I'd always been taught to live anyway.
>
> So now here it is, four years later that I've been a free man as opposed to those three months. I've been working everyday since the date of my release, and surrounded myself with nothing but positive people. I'm currently a Foreman at Global Roofing/Figures Investments.  I also do landscaping and power washing on the side. I  also help out the Reverend Darrel Spencer  (Spencer's Tree Service) with his tree service business.  He has become a great teacher and mentor of mine and I've been attending church regularly.
>
> I now have a beautiful young daughter. My first child whom I love and cherish dearly. She unexplainably brightens my day like nothing else or no other. Regardless of anything, I know she needs me and I most definitely will not jeopardize our time together.
>
> All in all no one knows me like me, and I know for a fact that I've made a 180 degree degree turn and changed for nothing but the better. I'm aware that I still have a ways to go, but I've been on the right track now for a while and refuse to fall off.

Mr. Figures words suggest that he now reflects beyond the moment.  He has gained perspective and maturity.  When I suggested that he write a narrative of his life, I asked him to think how losing his father affected him.  To his credit, while he believes his life would have been different he does not see the loss of his father as playing a part in the choices he made.  In this regard I believe he underestimates the effect of losing his father at age fourteen.

We now know that the early teen years are times fraught with critical changes and hazards in the lives of young men and women.  It is a time when we come to know ourselves as individuals.

A time when teenagers can be highly impulsive and lacking in maturity. When that is combined with Mr. Figures "rebelliousness" and the tragedy of losing a father at fourteen, we can be assured that it had powerful, perhaps traumatic, influence in his life.

We all grieve differently. Indeed, Figures' younger siblings did not follow his path. I suspect that Figures' turbulent teen years were, in part, his way of grieving the loss of his father. His narrative suggests that he now reflects, and has learned to value the perspective gained from his life experience. He is now invested in his life, his family, and his daughter. These influences, rather than supervision or threat of incarceration, drive him. It is largely for these reasons that counsel submits that his supervised release term should be terminated.

## II.  If Mr. Figures Were Sentenced Today, He Would Face A Much Lower Sentence.

Apart from Figures' fairly unblemished record on supervised release, there are broader reasons supporting his request to end his SRT term. In 2007, the United States Sentencing Commission took its first step to reduce the then 100-1 crack cocaine disparity. In the Commission's view, the amendment was "only a partial remedy to some of the problems associated with the 100-1 drug quantity ratio," and urged a comprehensive solution from Congress. [1] The Commission added Amendment 706 to the list of amendments stated in Section 1B1.10(c), which may be applied retroactively, effective March 3, 2008.

In 2008, the undersigned counsel filed a motion to reduce Mr. Figures' sentence. This court denied the reduction stating: "3582(c)(2) does not apply when a defendant has been sentenced pursuant U.S.S.G. § 5G1.1(b) based on a statutory minimum sentence, regardless of any subsequent sentence reductions because the applicable mandatory minimum was higher than the applicable

---

[1] USSC, Cocaine and Federal Sentencing Policy 9-10 (May 2007).

4

guideline range."    Citing in support *United States v. Williams,* 549 F.3d 1337 (11th Cir. 2008) (Retroactive amendment to sentencing guidelines that reduced base offense levels based on quantity of crack cocaine was inapplicable to the sentence of a defendant who was sentenced pursuant to a ten-year mandatory minimum statute, notwithstanding the trial court's reduction based on substantial assistance given that the court's point of departure did not shift as a result of the amendment.)

In 2010, the United States Congress passed the Fair Sentencing Act.  In so doing, Congress eliminated the five-year mandatory minimum for simple possession, it increased maximum fines, and issued specific directives to the United States Sentencing Commission to amend the guidelines for all drug offenses.  Congress and the Commission ultimately recognized that the single minded focus on drug quantity was wrong and unfairly included minor drug offenders for harsher punishment than was necessary:

> "The Subcommittee's approach in 1986 was to tie the punishment to the offenders' role in the marketplace. A certain quantity of drugs was assigned to a category of punishment because the Subcommittee believed that this quantity was easy to specify and prove and 'is based on the minimum quantity that might be controlled or directed by a trafficker in a high place in the processing and distribution chain.' [H.R. Rep. 99-845, pt. 1, at 11-12 (1986)] **However, we made some huge mistakes.  First, the quantity triggers that we chose are wrong.  They are much too small.  They bear no relation to actual quantities distributed by the major and high-level traffickers and serious retail drug trafficking operations, the operations that were intended by the subcommittee to be the focus of the federal effort. The second mistake was including retail drug trafficking in the federal mandatory minimum scheme at all."** (Emphasis added)

Statement of Eric Sterling before the Subcommittee on Crime, Terrorism and Homeland Security, Committee on the Judiciary, U.S. House of Representatives (June 26, 2007).

As discussed above, the policy underlying the sentence reduction rests, in part, on the recognition that the penalties imposed on non-violent, low-level, drug offenders were unduly harsh. On April 30, 2014, the Commission issued an amendment to Section 1B1.10.  Amendment 782,

reduced by two levels the offense levels assigned to the quantities that trigger the statutory mandatory minimum penalties in §2D1.1, and made parallel changes to §2D1.11. On July 18, 2014, The Commission unanimously voted to give retroactive effect to Amendment 782. Unlike earlier retroactive amendments, in cases involving substantial assistance, the revised Section 1B1.10(c) of the Guidelines authorized the courts to proportionally reduce the sentence below the mandatory minimum. If Figures were still incarcerated today and the court granted a proportional reduction due to his substantial assistance, his actual sentence would likely have been reduced to approximately thirty months.

While defense counsel understands that these amendments operate only to reduce a defendant's sentence of imprisonment, not SRT, it is noteworthy that Mr. Figures has already served more than twice the actual penalty a person convicted of the same crime, and under the same circumstances, would serve today. Indeed, the eight-year SRT term is now more than twice the length of the imprisonment which would be appropriate today. When considered as a whole these policies suggest that SRT term in this case should come to an end.

In conclusion, Figures' has demonstrated for more than half of the eight-year SRT that he has adjusted exceptionally well upon returning to his community. First, he regained the trust and confidence of his family, in particular his mother. He has been consistently employed, drug-free, and has not committed any new crimes. In view of this exceptional record Figures moves the court to terminate his supervised release term.

                                                Respectfully submitted,

                                                s/Carlos A. Williams -WILLC9821
                                                2 South Water Street, 2nd Floor
                                                Mobile, Alabama 36602

                 251-433-0910
                 251-433-0686 (FAX)

## **CERTIFICATE OF SERVICE**

  I hereby certify that on February 1, 2016, a true and correct copy of the above and foregoing instrument was furnished to the Assistant U.S. Attorney assigned to this case, by e-mail, to:

Michelle O'Brien
U.S. Attorney's Office
63 Royal Street, Suite 600
Mobile, Alabama 36602

                 s/Carlos A. Williams